THE UNITED STATES DISTRICT COURT
FOR
THE NORTHERN DISTRICT OF NEW YORK

COLLEGE STANDARD MAGAZINE, JEFFREY SCOTT BAREA, and JULIEN A.M. STARR, Plaintiffs,

-against-   NO.03-CV-_____(___/___)  03-CV-0505 TJM/RFT

STATE UNIVERSITY OF NEW YORK AT Albany, and THE STUDENT ASSOCIATION OF THE STATE UNIVERSITY OF NEW YORK AT Albany Defendants.

---

### VERIFIED COMPLAINT

FOR A VERIFIED COMPLAINT, THE PLAINTIFFS ALLEGE:

#### JURISDICTION AND VENUE

1. Plaintiffs bring a civil rights action pursuant to 42 U.S.C. §1983 and §1988 for deprivations of Plaintiffs' rights secured by the First and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction is conferred on this Court by 28 U.S.C. §§1343(a)(3) and 1343(a)(4), which provide for original

1

jurisdiction in the Court of all suits brought pursuant to 42 U.S.C. §1983.

3. Jurisdiction is conferred on this Court by 28 U.S.C. §1331 because the cause of action arises under the Constitution and laws of the United States.

## PARTIES

4. Plaintiff, College Standard Magazine ("CSM"), is an unincorporated association and is a permanent recognized student organization ("RSO") at the State University of New York at Albany ("SUNY Albany") and is run by students who matriculate at SUNY Albany.

5. Plaintiff, Jeffery Scott Barea, is a student in good standing at SUNY Albany and is the publisher and the Editor in Chief of CSM.

6. Plaintiff, Julien Starr, is student in good standing at SUNY Albany and is the vice-president and an editorial of CSM.

7. Plaintiffs Barea and Starr are students in good standing at SUNY Albany.

8. Plaintiffs Barea and Starr paid their mandatory student fees of $80.00.

9. Defendant, the State University of New York at Albany ("SUNY Albany"), is a New York State created and funded

University that is organized pursuant to the New York State Education Law.

10. Defendant, Student Association, is created by SUNY Albany's By-Laws and is invested with the power to set and expend mandatory student activity fees.

11. Defendants principle place of business is located in the County of Albany, State of New York.

12. Venue properly lies in the Northern District of New York pursuant to 28 U.S.C. § 1391 in that Defendants reside in this Federal district.

## FACTS

13. This case is about discrimination and censorship of conservative viewpoints on the SUNY Albany campus.

14. Each year SUNY Albany students are required to pay a mandatory student activity fee of $ 80.00.

15. SUNY Albany, through the use of the mandatory student fee, has created a public forum for speech.

16. Pursuant to SUNY Albany policy, defendant, the Student Association, is in charge of administrating the money generated by the mandatory Student fee.

17. Upon information and belief, the mandatory student fee generates about 1.69 million dollars annually.

18. Pursuant to defendants' policy, the Student Associates distributes money to recognized student organizations ("RSOs").

19. Pursuant to defendants' policy, the Student Association funds RSOs through a three-step process.

20. First, the RSO presents a budget to the Finance Committee of the Student Association.

21. Second, the Finance Committee makes a recommendation to the Central Council (the legislative arm of the Student Association) of how much to fund the RSO.

22. Third, the Central Council votes on whether to adopt, reject, or modify the Finance Committee's recommendation.

23. The Student Association has funded various campus publications and political and social issue groups.

24. For example, five Dollars of each individual student fee goes directly to fund a left wing environmental advocacy and lobby group, The New York Public Interest Research Group, Inc. ("NYPIRG").

25. NYPIRG receives over $100,000.00 of the mandatory student fees.

26. The remaining amount of the fee is allocated by the Student Association to fund various Recognized Student Organizations ("RSOs").

27. Among the various RSOs that are funded by the Student Association are the NAACP ($2,500.00), the Pride Alliance (a group that promotes the Homosexual lifestyle)($3,650.00), Multicultural Affairs ($14,350.00), the Student Voice (a liberal student newspaper) ($5,500.00), the Women's Issue office ($10,250.00), The Affirmative Action Office ($10,250.00), and the Power Exchange (a sado-masochistic club)($200.00).

28. In September 2002, Barea, Starr and a group of conservative students gave birth to a conservative newspaper called the College Standard Magazine ("CSM").

29. The conservative students did this because there were no conservative publications on campus.

30. In September 2002, CSM applied for Recognized Student Organizations ("RSO") status.

31. On September 25, 2002, Student Association president Kirk Douglass granted CSM RSO status.

32. On or about September 25, 2002, CSM made a request for funding from the Student Association.

33. CSM submitted a budget to the Finance Committee of Central Council ("Finance Committee") pursuant to "Guidelines and Procedures for New and Unfunded Requests."

34. A true and accurate copy of the "Guidelines and Procedures for New and Unfunded Requests" is attached hereto as Exhibit A.

35. A true and accurate copy of CSM's budget that was submitted to the Finance Committee is attached hereto as Exhibit B.

36. CSM requested $5,862.05 for the publication of 9 editions of a 16-page tabloid.

37. The editions were to be published monthly from September to May.

38. CSM's fund request lay buried in the Finance Committee for months.

39. On October 3, 2002, CSM, by means of a donation, published and distributed 4,000 copies of the first issue of CSM.

40. The front-page articles included: "The NYPIRG Lie," an expose of the illegal funding of NYPIRG by use of mandatory student association fees; "Conservative voters v. Liberal N.Y," an analysis of the New York State Gubernatorial election; and "The Politics of Poverty & Welfare," an opinion piece advocating for the color blind distribution of government benefits.

41. The initial CSM edition proved to be a lighting rod.

42. Several thousand copies of CSM were stolen from stands.

43. Upon information and belief, a member of Pride Alliance, (the campus homosexual group), confiscated copies of CSM.

44. Upon information and belief, Joe Favata, vice president of the Central Council (the legislative arm of the Student Association), was involved in the taking of CSM papers.

45. Ultimately, Mr. Favata, although denying taking any papers, issued a written statement where he promised not to steal any future issues of CSM.

46. For the Academic year 2002-03, Mr. Ari Lipnick was and is the Chairman of the Finance Committee.

47. Shortly after the publication of the first edition of CSM, Scott Baera encountered Lipnick on campus.

48. Mr. Lipnick told CSM's Barea that "the most stupid move you could have made was to attack NYPIRG in your first issue."

49. In the beginning of October, CSM staff was asked to attend a Finance Committee meeting to discuss the budget request with Lipnick and then Vice Chairman of the Finance Committee Will Platnick.

50. The meeting was held in the Media Affairs Office of the Student Association office.

7

51. At the meeting, CSM's budget (Exhibit B) was reviewed line item by line item.

52. At the conclusion of the meeting, Lipnick asked Barea to step into the Student Association lounge area to discuss the possibilities for funding.

53. At this time, Lipnick told Barea there was the possibility of getting between $1,000 and $2,000, with the possibility of more after that.

54. On November 7, 2002, CSM was able to publish a second edition.

55. CSM headline article "NYPIRG SUCKS" exposed how mandatory student association fees were used to pay two non-student lobbyist $21,000.00 each.

56. The November 7, 2003, edition also contained a news article detailing Ra'anan Gissin's, Senior adviser to Isreali Prime Minister Ariel Sharon, speech to the SUNY Albany community and an Article that "debunked" a SUNY Albany Professor's "lies" on Iraq "step by step."

57. CSM had one of its meeting interrupted by the campus Muslim group who disagreed with the paper's articles dealing with Islam and Iraq.

58. In late November, Lipnick again discussed CSM's proposed budget with CSM managing editor Raven Clabough that CSM could expect $2,000 in funding.

59. On or about January 22, 2003, just after returning from Winter Break, Lipnick informed CSM's Barea that the Finance Committee would be voting on the budget request.

60. On or about February 10th, 2003, CSM published another edition with the headline "SA FRAUD?"

61. The article exposed alleged contract fraud committed by the Student Association Comptroller Alethea Tomapat and Student Voice (SA Student Publication) Editor in Chief Tony Gray.

62. It also included articles detailing alleged libel accusations made by NYPIRG against CSM.

63. On or about, February 4th, 2003, the Finance Committee approved a limited amount from CSM's budget request - $350.00.

64. Pursuant to SUNY Albany's Student Association Fee policy, the Finance Committee has no standard by which to decide the amount of money to be appropriated to a RSO.

65. Pursuant to SUNY Albany's Student Association Fee policy, the Finance Committee has unbridled discretion in its recommendations of monies for RSOs.

66. Pursuant to SUNY Albany's Student Association Fee policy, after approval by the Finance Committee, a RSO's

funding request is sent to the Student Association's legislative body, the Central Council, for approval.

67. On or about February 14th 2003, Central Council voted on a bill to provide CSM with a radically reduced budget of $350.00.

68. Pursuant to SUNY Albany's Student Association Fee policy, Central Council has no standard by which to decide the amount of money to be appropriated to a RSO.

69. Pursuant to SUNY Albany's Student Association Fee policy, Central Council has unbridled discretion in its appropriation of monies to RSOs.

70. Pursuant to SUNY Albany's Student Association Fee policy, Central Council need not provide an explanation for approving or rejecting of funding for a RSO.

71. CSM's request met stiff resistance from council members with ties to NYPIRG.

72. During the Central Council meeting, several council members advocated that the entire Council vote to deny CSM funding based on CSM's viewpoint.

73. For example, one council member, Anton Konev, stated, "Pride Alliance has been to judicial affairs because of this newspaper. We have students against this newspaper already. … That's is why I would say we should save this

10

money for someone who everybody thinks should get the money."

74. Another example of viewpoint discrimination was when Jamie McNamara, Chairman of Central Council said that "we don't need a conservative presence on campus."

75. Other council members defended the concept of freedom of speech.

76. The Council members who urged discrimination based on CSM's viewpoint prevailed.

77. CSM's slashed budget of $350 was defeated by a vote 14-6.

78. Every group that requested funding for the academic year 2002-2003, received funding.

79. CSM was the only group that was denied funding this year.

80. Upon information and belief, CSM was the only group **ever** in the history of the Student Association to be denied funding.

81. Plaintiffs have thus far relied upon gifts, donations and limited advertising to publish their paper.

82. Plaintiffs have incurred a deficit in the operation of the paper.

83. Without the relief requested below in the Wherefore clause of this complaint, plaintiffs are unlikely to be

able to publish their newspaper for the month of May and certainly will not be able to publish their paper for the next academic year.

## FIRST CAUSE OF ACTION

84. Plaintiffs repeat and reallege all the proceeding paragraphs of this complaint as if fully set forth herein.

85. Defendants have violated plaintiffs' right of freedom of speech guaranteed by the First Amendment of the United States Constitution by not funding CSM based upon its conservative viewpoint.

## SECOND CAUSE OF ACTION

86. Plaintiff repeats and realleges all the proceeding paragraphs of this complaint as if fully set forth herein.

87. Pursuant to defendants' policy, the Finance Committee has unbridled discretion in its recommendation of the amount of the appropriation to RSOs.

88. There are no written criteria for the Finance Committee that describes how much to fund a RSO.

89. Each individual member of the Finance Committee is empowered to reject a funding request for any reasons or no reasons at all.

90. Likewise, pursuant to defendants' policy, there are no written criteria for the Central Committee that describes how much to fund a RSO.

91. Each individual member of Central Committee is empowered to reject a funding request for any reasons or no reasons at all.

92. The Central Council majority did not adopt a finding of why CSM was denied funding.

93. Defendants have violated plaintiff's right of freedom of speech guaranteed by the First Amendment of the United States Constitution because the Student Association is vested with unbridled discretion in deciding which groups get funded and for how much.

**WHEREFORE,** Plaintiffs asks this Court (1) to declare that defendants' action in denying plaintiffs' request for Student Association funding violated the First Amendment to the United States Constitution because such denial was based on the viewpoint of plaintiffs' speech; (2) to declare defendants' action in denying plaintiffs' funding for their violated the First Amendment to the United States Constitution because such denial was based on the unbridled

discretion of the defendants; (3) to order the defendants to allot plaintiffs $550.00 from the Student Activity fee so plaintiffs can publish an edition of their newspaper for May 2003, (4) to order the defendants to allot plaintiffs $4,950.00 from the Student Activity fee so plaintiffs can publish monthly editions of their newspaper for the school year 2003-2004, (5) to award plaintiffs the money that they were entitled to receive for the publication of CSM for the 2002-2003 school year, (6) to award plaintiffs the cost of prosecuting this action together with attorney fees pursuant to 42 U.S.C. §1988, and (7) to grant other and different relief that the Court, in the exercise of its wisdom and discretion, deems just and proper.

JEFFREY SCOTT BAREA, being duly sworn, states he has read the foregoing complaint and the same is true to his own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters, he believes them to be true.

*/s/ Jeffrey Scott Barea*
JEFFREY SCOTT BAREA

Sworn before me this 23rd day of day of April 2003.

*/s/ This V. Tuttle*
Notary Public
Commission in Albany County
Comm. expires 6/1/03
Regs No. 02MA6059783

14

Julien Starr, being duly sworn, states he has read the foregoing complaint and the same is true to his own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those matters, he believes them to be true.

_____
Julien Starr

Sworn before me this 23rd day of day of April 2003.

_____
Notary Public
Thos Marcelle   Commissioned Albany County expired 6/1/03 Res no. C2MA6039783

Submitted on this 22 day of April, 2003

_____
Thomas Marcelle (Bar Roll No. 112107)
Counsel for the Plaintiff
71 Fernbank Ave.
Delmar, New York 12054
(518) 475-0806

# EXHIBIT A

# GUIDELINES AND PROCEDURES FOR NEW AND UNFUNDED REQUESTS

Finance Committee

Campus Center 11
1400 Washington
Albany, NY 1222
(518)442-5640
(518)442-5622 F.



## Introduction:
New and Unfunded Allocations: Any permanently recognized, non-funded group wishing to receive an appropriation may be budgeted through the New and Unfunded Groups Account.

## Preliminary Steps:
1. Obtain a request form at the front desk in the Student Association office.
2. Fill out the form as completely and detailed as possible giving special attention to your proposed budget. to avoid delays, pay close attention to questions, and give adequate and complete answers.
3. Attach any supportive/explanatory documents. (examples: letters of support, co-sponsorships from other campus groups, or community endorsements.)
4. Make and keep a copy of the request form and any documents for your records. This is not mandatory, but it is for your benefit.
5. Return the completed forms at the front desk of the Student Association Office. Have an Administrative Assistant fill out the portion labeled *For Office Use Only* section at the end of page two of the application and they will place it in a sealed envelope labeled, " Attention Chair or Vice Chair of Fi-Com". Make sure an Administrative Assistant signs the request forms and indicates the dates and time at which the forms were submitted.
6. Sign the Appointment Sheet for an available date and time your group can meet with the Finance Committee to discuss your request. The Appointment Sheet will be on the Central Council bulletin board outside the Central Council office. Finance Committee meetings are held on Monday nights at 8:00 PM, in Campus Center Room 357. Note: It is the group's responsibility to schedule an appointment with the Finance Committee Requests will not be heard without proper representation from the organization. Any group that misses an appointment due to their lack of responsibility, will be taken off the Appointment Sheet, upon which they must schedule a new appointment with the Finance Committee.
7. In order for the Finance Committee to consider a request, all forms must be submitted by **5:00 PM , Thursday** the previous week. Any group submitting request forms after 5:00 PM Thursday, will only be permitted to schedule an appointment for two weeks later. Again, to avoid any and all delays, groups are strongly encouraged to submit their request forms at least two weeks in advance.

## Finance Committee Steps:
1. Requests will be reviewed for completeness. The Finance Committee will contact you if there should be any questions.
2. If the request form is complete, the organization will be contacted to confirm their scheduled appointment.
3. You will appear before the Finance Committee to explain your request and to answer any questions the Finance Committee may have.
4. During your scheduled appointment (a total of 30 minutes) you will have 10 minutes to explain your request. You must then be able to field questions form the committee.
5. Finance Committee will deliberate, and you will be notified of Finance Committee's decision no later than the following day.

## Pre-Central Council Steps:

1. Upon Approval by the Finance Committee, a Bill for new and unfunded allocations will be placed on the Agenda under the Legislative report at the discretion of the Central Council Chairman during Central Council's regularly scheduled Wednesday meeting at 7:30 PM in the Campus Center building, Assembly Hall.

## Central Council Steps:

1. Central Council shall make the final decision on all new and unfunded requests. It is strongly encouraged that representatives from your group attend the Central Council meeting, in order to answer any further questions that the Council may have for the group.
2. At the Central Council meeting you will know whether your request is approved, and make note of the Bill number for your records. Its is suggested that the organization obtain a copy of such from the Vice Chair or Chair of Central Council at the meeting.
3. Once approved within seven (7) days you should check with Comptroller's office in the Student Association office that your approved request (Bill with Number) has been received.
4. If your bill is not at the Comptroller's office, check with the Vice-Chair or Secretary of Central Council as soon as possible to obtain a copy of your Bill with the signature of the Student Association's President. Copies of the signed bills are maintained in the Council's file cabinet. Make two copies of the signed Bill and give one directly to the Comptroller's office. Make note of whom you give the copy too. Keep the other copy for your records. It is suggested that during the entire request, that you keep records of who you talk with and when.

# EXHIBIT B

# Weekly Budget

| | Sept | Oct | Nov | Dec | Jan | Feb | March | April | May |
|---|---|---|---|---|---|---|---|---|---|
| **Income** | | | | | | | | | |
| Advertising | | | | | | 595 | 475 | 750 | 750 |
| Donations | | | | | 29 | 100 | 100 | 100 | 100 |
| Classifieds | | | | | 28.5 | 150 | 15 | 175 | 175 |
| Subscriptions | | | | | 32 | 30 | 30 | 30 | 30 |
| Grants | 487 | 500 | | 210 | | | 1000 | 1000 | 1000 |
| | 487 | 500 | 0 | 210 | 83.5 | 875 | 1620 | 2055 | 2055 |
| **Expenses** | | | | | | | | | |
| Printing 4@380 | 1440 | 1440 | 1440 | 1440 | 1440 | 1440 | 1440 | 1440 | 1440 |
| 16 Page Tabloid @ 4,000 copies | | | | | | | | | |
| Sho-Rack Newsstands | | | 725 | | | | | | |
| Shipping | | | | | | | | | |
| Website | 8.95 | 8.95 | 8.95 | 8.95 | 8.95 | 8.95 | 8.95 | 8.95 | 8.95 |
| | 1446.95 | 1446.95 | 2171.95 | 1446.95 | 1446.95 | 1446.95 | 1446.95 | 1446.95 | 1446.95 |
| | -959.95 | -1906.9 | -4078.85 | -5315.8 | -6679.25 | -7251.2 | -7078.15 | -6470.1 | -5862.05 | -5862.05 | 0 |

TOTAL P.07